IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

| | |
|---|---|
| 4 H CONSTRUCTION CORPORATION | COUNTER-DEFENDANT/ PLAINTIFF |
| V. | CIVIL ACTION NO.: 4:08CV113-DAS |
| SUPERIOR BOAT WORKS, INC., COLLINS BRENT D/B/A SUPERIOR BOAT WORKS, INC. AND BARGES PB-0612 AND PB-0604 | COUNTER PLAINTIFFS/ DEFENDANTS |

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

This case came on to be heard by the court on the plaintiff's complaint and defendant's counter-claim. A bench trial was held June 15-16, 2009, and the court, having heard and considered the evidence presented by the parties during the trial of this matter, hereby enters the following findings of fact and conclusions of law:

**I. FINDINGS OF FACT**

This action arose out of maritime repairs and related necessaries performed by the defendant, Superior Boat Works Inc., ("Superior") to two deck barges owned by the defendant, 4 H Construction Corporation ("4 H"). 4 H initially filed it's complaint against Superior and its President Collins Brent alleging claims of conversion. Superior answered with a denial of the plaintiff's claims and filed its counterclaim seeking damages for breach of contract, misrepresentation, and a maritime lien as security for its damages, but agreed to hold the arrest of the barges in abeyance. Superior also filed an alternative claim for *quantum meruit* and/or unjust enrichment.

1

After purchasing the two barges PB-0604 and PB-0612 in Alexandria, Louisiana, 4 H Construction Company moved them via the Red and Mississippi Rivers to Vicksburg, Mississippi where Jim Harris and other 4 H employees performed some repairs on them. While the barges were docked in Vicksburg, Mr. Harris received at least two telephone calls from Jimmy Montgomery of Superior who represented that Superior could perform repairs on these barges much more quickly than Mississippi Marine. There is a wide divergence between the parties as to what, if anything, was said or agreed to during these and later conversations between Mr. Montgomery and Mr. Harris, but it is clear that Mr. Harris eventually agreed to have Superior perform the repairs.

The two barges were therefore picked up in Vicksburg, Mississippi at 2:00 a.m. on July 15, 2008 by the MV Johnny Coe and delivered to Superior's premises in Lake Ferguson between 11:30 p.m. on the 15th and 12:30 a.m. on the 16th of July, 2008. (Ex. P-13). On the morning of July 16, 2008 the barges were placed in Superior's dry dock. According to Mr. Harris, he had requested to be notified as soon as the barges were placed in dry dock and he, having received a telephone call from Mr. Montgomery, arrived at the dry docks between 1:30 and 2:30 p.m on the 16th. According to Mr. Harris, it was on the 16th at the Superior dry docks that Mr. Montgomery first mentioned doing work on these barges on a time and materials basis. Mr. Harris testified that in response to Mr. Montgomery's suggestion that a time and materials contract would be cheaper, Mr. Harris replied once again that no work was to be done on the barges until 4 H received and accepted a firm quote setting forth the total cost of repairs. Mr. Montgomery gave an entirely different account of what transpired on the dry docks on July 16, 2008. He recalled that Mr. Harris came to the dry docks that day and that he, Mr. Harris, and Elbert

2

Redmond inspected the barges. Mr. Montgomery also testified that work on the barges was ongoing at that time and Mr. Harris never objected to it. According to Montgomery, sometime during the second day of repairs (July 17th) he received a telephone call from Mr. Harris requesting an estimate of the total cost of repairs, but Mr. Harris did not ask him to stop work until he received that estimate and approved it.

On the afternoon of July 17th at 3:07 p.m., Montgomery faxed a firm estimate to 4 H setting forth the repair costs for PB-0604 at $20,100.00 and the repair costs of for PB-0612 at $11,000.00. (Ex. P-5). Although Mr. Montgomery testified at trial that Mr. Harris telephoned him the next day (the 18th) and notified him to cease all repairs, Mr. Harris' testimony and telephone records (Ex. P-9) reflect a nine minute call was made to Superior at 3:15 p.m. on July 17th. This call was followed by a faxed message to cease all repairs which was received at Superior at 5:07 p.m. (Ex. P-6).

On July 18, 2008 Mr. Harris returned to the Superior premises to discuss with Mr. Montgomery what he considered an exorbitant repair estimate in light of what it would have cost 4 H to repair these barges had it done the work itself. He arrived shortly after noon and when he saw work still proceeding on the barges despite his phone call and fax, he protested to Mr. Montgomery who replied that those repairs are "on us." Nevertheless, after discussing the matter, the parties could not come to an agreement as to the cost of repairs done to the barges. Superior then completed the repairs and returned the barges to the water.

On July 30, 2008, Mr. Montgomery forwarded to 4 H invoices for the work Superior claimed it performed on the barges. (Ex D-5 and D-6). These invoices reflected charges of $16,193.66 on PB-0604 and $9,308.11 on PB-0612. Since that time additional invoices have

3

been prepared which have dramatically increased the sums Superior claims that 4 H owes due to moorage fees of $30.00 per day per barge. 4 H has refused to pay these sums, but the record reflects that in August 2008, Mr. Harris and Collins Brent had telephone discussions about these barges and the amounts owed.

Although Superior took the position at trial that it never denied 4 H Construction the right to pick-up these barges, Mr. Brent admitted on cross-examination that during these conversations in August he did refuse to allow 4 H to retake possession of its barges until "appropriate arrangements" could be made to pay the sums that Superior claimed were due. Mr. Brent conceded that the appropriate arrangements meant Superior would be paid for the amount billed. Mr. Harris did offer $11,000.00 to Mr. Brent in order to obtain possession of these barges but Superior declined and retained possession. The barges were still floating at Superior's premises at the time of trial.

## CONCLUSIONS OF LAW

### I. DISSOLUTION

Following trial, the court had the parties submit proposed findings of fact and conclusions of law. After examining the proposed findings, the court ordered additional briefing as to the administrative dissolution of Superior Boat Works, Inc. The facts are undisputed that the Mississippi Secretary of State administratively dissolved Superior Boat Works, Inc. on December 30, 2003 (ex. P-14) for failure to file its annual report in a timely fashion. This dissolution was authorized by the Mississippi Business Corporation Act, specifically Mississippi Code Ann. §79-4-14.20(2). Pursuant to § 79-4-14.21(c) the corporate existence of Superior Boat Works, Inc. continued, but it was not authorized to carry on any business "except that necessary to wind up

and liquidate its business and affairs...." Also pursuant to § 79-4-14.22(a),[1] Superior Boat Works, Inc. had a period of five years to reinstate the corporation after the effective date of dissolution. On December 30, 2008, Superior Boat Works, Inc. lost the capability under the above statutes to reinstate the corporation.

The evidence showed at trial that during the period of dissolution, Superior Boat Works, Inc. did not, in accordance with the above statutes, begin winding up its business. Instead, as readily acknowledged by its president, Collins Brent, the company continued in its maritime repair and construction business. While Mr. Brent did not provide any authority for his position that Superior could continue to do business, Superior and Mr. Brent now contend that Superior's corporate identity was dissolved "via a mere administrative process for failure to file an Annual Report and pay a $25.00 filing fee." Superior goes on to explain it was "pursuing the administrative steps necessary for reinstatement." These steps include filing an Application for Reinstatement pursuant to § 79-4-14.22 "which would then be deemed denied by the Secretary of State. After the written denial is received the corporation then submits its Application to the Chancery Court of Hinds County who routinely reinstates the corporation as an *ex parte* proceeding . . . ."

While the court does not doubt that many of these steps are indeed routine, § 79-4-14.23, cited by Superior, provides only that the Chancery Court *may* order the dissolved corporation

---

[1] This statute was amended as of July 1, 2009 approximately fifteen days after the trial of this matter. See, 2009 Miss. Laws Ch. 527(H.B. 515) and 2009 Miss. Law Ch. 530 (S.B. 3060). As noted in this legislation, the amended statute shall take effect and be in force from and after July 1, 2009. As a matter of statutory construction, unless express intent appears in any legislation, it is presumed that it will have prospective applicability only. *Mladinich v. Kohn*, 189 So. 2nd 481, 483 (Ms 1966). See also, 82 CJS Statutes §416.

reinstated.  Additionally, should the Chancery Court do so, this decision is appealable.  In other words, reinstatement is not a given, and to treat it as such would be contrary to law.  To assume that Superior will continue the process, and that the Chancery Court will reinstate it, and that there will be no appeal is to speculate, and this court is not willing to do so.  Had Superior completed the process prior to trial, the outcome would possibly be different, but because Superior had not completed the process, the court must find that during the period relevant to the present litigation, Superior Boat Works, Inc. was not a viable entity and thus did not have standing to enter into the contracts at issue.  It follows, therefore, that Superior's claims for breach of contract, misrepresentation, and *quantum meruit* are moot and shall be dismissed.[2] *See Funderburg v. Pontotoc Electric Poser Assoc.*, 6 So. 3d 439, 442 (Miss. Ct. App. 2009) (holding power of corporation to file lawsuit in its corporate name expires if corporation is suspended).

Next, the court looks to the effect this administrative dissolution had on the liability of the other defendant, Mr. Brent, for corporate torts as well as his right to assert a counter-claim in this cause.  The Mississippi Supreme Court has provided an answer to the former issue in *Carolina Transformer Co., Inc. v. Anderson*, 341 So. 2nd 1327 (Miss. 1977).  There the court found that under the statutory scheme then in force, the owner of a corporation was personally liable for corporate debts and liabilities incurred after the administrative dissolution of the

---

[2]As to Superior's argument that such a finding would result in "chaos" for the American financial system, the court finds that argument without merit.  In support of its argument, Superior contends, "if Mississippi corporations could merely be relieved of their liability because of an administrative dissolution then corporations across the State would claim they do not owe their creditors during any period of administrative dissolution."  This court's holding does not relieve a dissolved corporation its debts or obligations, only its ability to enter into contracts or otherwise conduct business.

corporation. The holding in *Carolina Transformer Co.* was later limited to those owners of the corporation, like Mr. Brent, who played an active role in the management of the company. *See Flanagan v. Jackson Wholesale Building Supply Co.* 461 So. 2nd 761, 764 (Miss. 1984); <u>Liability of Shareholders, Directors, and Officers Where Corporate Business is Continued After Its Dissolution,</u> 72 ALR 4th 419. Specifically, the supreme court held: "The liability for corporate debt imposed by the provisions of § 79-3-285 should be limited to those officers and directors who are actively involved in the control and management of the corporation." *Flanagan*, 461 So. 2d at 765. Mr. Brent's testimony at trial made it clear he was involved in the control and management of the corporation. Indeed, Mr. Brent had been president since 1980.

The court must also determine whether Collins Brent, as president of Superior Boat Works, Inc. and a twenty-five percent shareholder therein, had the right to sue in this case on behalf of Superior. There is no proof of any assignment to Mr. Brent by the corporation of any chose in action as contemplated under §11-7-7 of the Mississippi Code. Moreover, the Mississippi Supreme Court has held under these circumstances that Mr. Brent would have no standing to pursue this action on behalf of the corporate entity. *See Bruno v. Southeastern Services, Inc.*, 385 So. 2nd 620 (Miss. 1980); *see also*, *Nationalcare Corporation, Inc. v. St. Paul Property & Casualty Insurance Co.* 22 F. Supp 2nd 558 (S.D. Miss. 1998); *Howell Steel Co. Inc. v. Trustmark National Bank*, 666 F. Supp 930 (S.D. Miss. 1987).

Consequently, the Court finds that Collins Brent, individually, may be held liable for the corporate torts committed by Superior, but he had no authority to sue on a contract that belonged to the corporation, Superior Boat Works, Inc. Accordingly, all claims brought by Superior and

Mr. Brent are hereby dismissed.[3]

## II. CONVERSION

The court turns now to 4 H's claim for conversion. 4 H claims, of course, that Superior converted property belonging to 4 H when following the repair work, it refused to return the barges. It is well established that courts may apply state law when it "does not contravene any acts of Congress, nor work any prejudice to the characteristic features of the maritime law, nor interfere with its proper harmony and uniformity in its international and interstate relations." *Just v. Chambers*, 312 U.S. 383, 389 (1941). The application of state law for conversion of the barges in this case would not interfere with the uniformity or characteristic features of admiralty and maritime law. Therefore, the court concludes that the Mississippi law of conversion – the state where the alleged conversion occurred – is relevant to this cause of action.

On numerous occasions, the Mississippi Supreme Court has addressed the tort of conversion with the following language:

> It is well established that the acts alleged to constitute a conversion must be positive and tortious. In *McJunkin v. Hancock*, 71 Okla. 257, 176 P. 740 (1918), the Court said: "To make out a conversion, there must be proof of a wrongful possession, or the exercise of a dominion in exclusion or defiance of the owner's right, or of an unauthorized and injurious use, or of a wrongful detention after demand." In *Spooner v. Holmes*, 102 Mass. 503, 1869 WL 5777, the Court said: "Action of tort . . . cannot be maintained without proof that the defendant either did some positive wrongful act with the intention to appropriate the property to himself, or to deprive

---

[3]The court is cognizant of the defendant/counter-plaintiffs' claim for *quantum meruit*, and the court is aware that such a claim would likely be practical in a situation similar to the present one had either Superior or Collins Brent had standing to pursue an action at all. However, because the court finds that neither party may bring an action, it follows that to allow a claim – even one for *quantum meruit* – is impossible with no party to whom the court could allow damages.

> the rightful owner of it, or destroyed the property." In *69 *Lee Tung v. Burkhart*, 59 Or. 194, 116 P. 1066 (1911), the Court held that in order to maintain an action for conversion, there must have been, on the part of the defendant, some unlawful assumption of dominion over the personal property involved, in defiance or exclusion of the plaintiff's rights, or else a withholding of the possession under a claim of right or title inconsistent with that of the plaintiff.

*First Investors Corp. v. Rayner*, 738 So. 2d 228, 234-35 (Miss. 1999) (quoting *Mississippi Motor Fin., Inc. v. Thomas*, 149 So. 2d 20, 20-21 (Miss. 1963)). Thus, there is a conversion only when there is an "intent to exercise dominion or control over goods which is inconsistent with the true owner's right." *Rayner*, 738 So. 2d at 234. While intent is necessary, it need not be the intent to be a wrongdoer. *Id.*

In the present case, the parties stipulated in the pretrial order that 4 H owned the barges at issue. Additionally, Mr. Harris and Mr. Brent testified that during a telephone conversation, Harris asked that Brent return his barges to 4 H. Brent testified specifically that he told Harris, 4 H could not have its barges until proper arrangements were made – that is, payment of approximately $25,000. At trial, Superior argued it withheld the barges because it held a lien against them for the repairs done. As 4 H points out, however, the present action is one the court heard pursuant to its admiralty jurisdiction, and maritime liens are treated differently than those found at common law. Specifically, as Professor Tetley explains:

> In the United States the repairman need not retain possession to invoke his lien because the repair lien is a true maritime lien which travels with the *res*. . . . .
> Under American maritime law, the supply lien does not require possession. In fact possession by the supplier would defeat the purpose of both the supplies and the lien, which is to enable the ship to complete the voyage.

William Tetley, Maritime Liens and Claims 265-66 (1st ed. 1985). There is no doubt but that

9

Superior held a lien on both barges. Title 46 § 31342 provides in pertinent part:

> [A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner –
>
> (1) has a maritime lien on the vessel;

46 U.S.C. § 31342 (2007). In addition, it is clear the lien attached at the time the repairs were made. *See Pan American Bank of Miami v. Oil Screw Denise*, 613 F.2d 599, 602 (5th Cir. 1980) (holding maritime lien is created at time repairs are made).

Consequently, the issue before the court appears to be a simple matter. Superior repaired the barges but refused to return the barges to 4 H after 4 H refused to pay the amount billed and demanded that the barges be returned. The law is clear that Superior did not need possession to retain a lien on the barges. In other words, Superior could have returned the barges to 4 H without abandoning its lien. So it appears Superior converted the property. The question before the court, however, is not so clear as it may appear at first blush.

The difficulty lies with the language cited by Professor Tetley and others. Specifically, the authorities consistently make it clear that the maritime supply lien does not *require* possession. *See, e.g., Chase Manhattan Financial Services, Inc. v. McMillian*, 896 F.2d 452, 456 (10th Cir. 1990) ("Maritime liens generally are 'secret' in that neither possession nor notice through filing is required to establish their validity."); *Bermuda Express, N.V. v. M/V Litsa*, 872 F.2d 554, 557-58 (3d Cir. 1989). This cannot be disputed. The question before the court, however, is whether it follows necessarily that retaining possession in such an instance (when possession is not necessary) amounts to conversion. After extensive research, this court has not found any authority addressing the specific issue. Consequently, the court considers the matter in

light of the policy behind the maritime lien and the concept that it travels with the *res*. As noted *supra*, the purpose behind allowing the lien to travel is to allow the ships to complete their voyage; in other words, to allow them to stay in operation rather than simply moored in a repairman's boatyard. Traffic on the water is far more limited than on land. Vessels utilized are typically extremely valuable and capable of transporting immense loads albeit at a relatively slow pace. It is sensible, therefore, to discourage lien holders from attempting to retain possession of such vessels when an owner may well own very few and cannot afford cessation of his operation for the time it may take to settle a dispute such as the present one. In the present case, 4 H needed the barges repaired to continue operating. Ted McCoy testified for the plaintiff and explained his plan to rent both barges for approximately three to four months for $5,000 per barge per month. Mr. McCoy also testified that he was unable to rent the barges because Superior would not release them to 4 H. It appears to the court this is precisely the type situation maritime jurisprudence seeks to avoid by allowing maritime liens to travel with the *res*.[4] Accordingly, the court finds Superior and Collins Brent liable for the conversion of both barges owned by 4 H.

### III. DAMAGES

As to damages, the court looks first to the testimony of Mr. McCoy. Mr. McCoy testified that he had agreed with Mr. Harris and 4 H to rent the barges for three to four months at $5,000 per barge per month. There was essentially no evidence to refute this agreement, and the court having seen Mr. McCoy testify, finds his testimony to have been entirely credible. Consequently, based on the lost contract with Mr. McCoy's company, T & T Dredging, the court finds Superior

---

[4]The court is certainly aware that there are numerous other examples as to why maritime liens are allowed to travel with the *res*. Oftentimes vessels carrying perishable cargo, as an example, must continue for obvious reasons.

11

and Collins Brent liable to 4 H for $30,000 or the lost rent for a three-month period.

Also, Mr. Harris testified that because Superior would not release the barges, 4 H was forced to rent an additional barge to complete a project. Harris testified that this cost 4 H $875.[5]

At this point it therefore would appear that a judgment awarding 4 H $30,875 would be appropriate, but the court is troubled by such an award because repairs were certainly done. In other words, to force Superior to return the barges without any form of remuneration does not appear equitable. The parties dispute the amount owed but not that work was done. As was the situation in *Florida Bahama Lines, LTD v. The Steel Barge 'Star 800' of Nassau*, "the circumstances of this case are peculiarly attuned to the gentle strains of admiralty's equity jurisdiction which, in 'its traditional liberality . . . seeks out the intrinsic justice of a cause . . . .'" *Florida Bahama Lines, LTD v. The Steel Barge 'Star 800' of Nassau*, 433 F.2d 1243, 1249 (5th Cir. 1970) (quoting *Vega v. Malula*, 291 F.2d 415, 416 (5th Cir. 1961)). The Fifth Circuit has repeatedly given "fullest play to the concept that admiralty jurisdiction embraces the resources of equity whenever the need arises." *Florida Bahama Lines*, 433 F.2d at 1249. Understanding this, the court must determine what it believes is a fair value for the repairs done. Clearly, the parties disagree as to the amount.

However, after examining the pretrial order in which 4 H explained: "Based on Mr. Montgomery's representations, plaintiff agreed to allow Superior to undertake the repairs upon

---

[5]In its proposed findings, 4 H included as damages a fee it posted for an admiralty bond posted in November. However, the only evidence before the court related to these damages is an estimate made by Mr. Harris of "about $800." On cross-examination, Mr. Harris called that amount a "guess." Because Mr. Harris clearly is unsure of the amount and because there is no other evidence before the court to make a determination, the court will not include damages related to this fee in its award.

the condition that a firm estimate of the cost of repairs would be provided before any work in excess of the original estimate was done." 4 H provides the "original estimate" as "approximately $6,000.00 to $7,000.00 per barge." While the court is aware that Mr. Harris disagreed with this portion of the pretrial order at trial, stating essentially he did not examine the document closely before it was submitted to the court, this amount did recur throughout trial. Indeed, Mr. Harris himself testified that Mr. Montgomery gave him a range of figures and set a parameter when discussing possible cost of repairs. Mr. Montgomery likewise described giving Mr. Harris a range, although he described it as between seven thousand and twenty-three thousand dollars. After hearing both witnesses testify, however, it is clear to the court what occurred.

The court finds that while Mr. Montgomery may well have told Mr. Harris the price could rise as high as twenty-three thousand dollars, it is clear Mr. Harris believed the cost would be approximately six thousand five hundred dollars per barge. It is also clear that Mr. Harris believed (as the pretrial order provided and as common sense would dictate) that should the costs appear to Mr. Montgomery to be far above that amount, Superior would inform 4 H before making the repairs. Regardless, Superior did not contact Mr. Harris and completed the repairs, billing 4 H approximately twenty-five thousand dollars. The parties clearly did not agree to such a figure, and thus, the court is left to decide a fair price for the repairs done. Because the parties agreed to *at least* six thousand five hundred dollars, the court finds that to be a reasonable price and will reduce 4 H's award accordingly.

Finally, counsel for 4 H asks for attorney's fees and punitive damages. As counsel points out, attorney's fees are allowable when the opposing party has acted with malice or with wanton

13

disregard for the rights of the plaintiff.  *See Cardinal Shipping Corp. v. M/S Seisho Maru*, 744 F.2d 461, ddd (5th Cir. 1984).  Similarly, punitive damages are allowable when the opposing party's intentional or wanton and reckless conduct amounted to a conscience disregard fo the rights of others.  *See CEH, Inc. v. F/V Seafarer*, 70 F.3d 694, 699 (1st Cir. 1995).  While the court finds Superior liable for conversion, the court does not find that Superior's actions rise to the level that would warrant an award of either attorney's fees or punitive damages.  Certainly, Superior acted intentionally, but the evidence was not clear as to whether they were fully aware that to retain possession of the barges would subject them to liability.  While it is hornbook law that ignorance of the law is no excuse, the court does not believe such behavior amounts to either malice or wanton and reckless conduct.  *See Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 353 (5th Cir. 1993) (indicating that ignorance of the law is an insufficient basis for Rule 60(b)(1) relief); *Peters v. United States*, 9 F.3d 344, 345 (5th Cir. 1993) (observing that ignorance of the rules does not suffice for good cause for failure to comply with service requirements of Rule 4).

## IV.  CONCLUSION

Accordingly, based on the findings of fact and conclusions of law stated herein, the court hereby dismisses the claims of Superior and Collins Brent with prejudice.  The court further finds that 4 H Construction Corporation is awarded a judgment over and against Superior Boat Works, Inc. and Collins Brent jointly and severally in the total sum of $ 17,875.  The court also orders the immediate return of the barges PB-0604 and PB-0612 returned to 4 H.  A judgment consistent with these findings of fact and conclusions of law will be entered accordingly.

This the 11th day of September 2009.

/s/ David A. Sanders
UNITED STATES MAGISTRATE JUDGE